UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ABIDAN F. MUHAMMAD,

Plaintiff,

DECISION and ORDER

-vs-

10-CV-6074-CJS

WAL-MART STORES EAST, L.P.,

Defendant.

APPEARANCES

For Plaintiff:           Christina A. Agola, Esq.
                         Christina A. Agola, PLLC
                         1415 Monroe Avenue
                         Rochester, New York 14618

For Defendant:           Michael S. Hanan, Esq.
                         Fox Rothschild LLP
                         997 Lenox Drive, Bld. 3
                         Lawrenceville, New Jersey 08648

INTRODUCTION

This an action for employment discrimination under the Americans With Disabilities Act and Title VII.  Now before the Court is Wal-Mart Stores East, L.P.'s motion for summary judgment. (Docket No. 22).  The application is granted, and Plaintiff's attorney is ordered to show cause why sanctions should not be imposed on her.

1

BACKGROUND

Plaintiff Abidan Muhammad is a male who identifies his race as "black."[1] Plaintiff was employed by Defendant Wal-Mart for only seven months, including two months spent on medical leave.

On February 29, 2008, Defendant hired Plaintiff as an Overnight Deli Stocker at its store on Chili Avenue in Rochester, New York.  As a deli stocker, Plaintiff's duties were "[t]o stock meat, to get the meat, put it in the freezer, and then to restock it in the coolers outside." Pl. Dep. at 55.   There is no indication that when applying for this job, Plaintiff indicated that he would be unable to handle pork products due to his Muslim faith, or that such faith ordinarily interfered with him performing his job, which manifestly involved handling pork.   Plaintiff indicates, however, that on one occasion he complained to a supervisor about having to handle pork:

> One time we was during the holiday season – you know, my last name is Muhammad.  And, you know, Muslims don't touch or eat pork.  Dan forced me to pick the pork up, and I told him I couldn't touch it.  . . .  He said, "No, you're not supposed to eat it.  And it's your job, so you got to do it."

Pl. Dep. at pp. 311-313.  It does not appear that Plaintiff pursued the issue further, and at a subsequent hearing  before the Worker's Compensation Board, Plaintiff indicated that his regular job duties included handling pork: "I was doing a lot of restocking meats, fresh meats like beef, pork, stuff like that." Def. Summary Judgment Motion [#22] , Ex. M at p. 4.

---

[1]Pl. Deposition at 260.

In June 2008, Plaintiff experienced pain in his hands.  On July 12, 2008, Plaintiff requested an initial one-month leave of absence for carpel tunnel syndrome, which Defendant granted.  On July 14, 2008, Plaintiff completed an application for worker's compensation benefits.  Defendant initially opposed the application, but Plaintiff was later granted benefits.  After Plaintiff's initial medical leave expired, Defendant granted him two additional extensions of medical leave.  On September 10, 2008, Plaintiff returned to work, with a doctor's note stating: "[Plaintiff] may not do repetitive use of hands and may not lift [greater than] 25 pounds...these restrictions will last until October 1st, 2008."

In response to the doctor's note, Defendant assigned Plaintiff to the position of Greeter during his usual overnight hours.  A Wal-Mart Greeter's duties are to welcome customers as they enter stores and to place stickers on bags of items a customer wishes to return.

There was already another employee, Shanelle Cherry ("Cherry"), who was working as a Greeter due to her own medical restrictions.  Plaintiff and Cherry both worked as Greeters at the same time.  Occasionally, though, both were required to perform "re-shops," which involved taking un-purchased merchandise from the front of the store and returning it  to the store's shelves, at their own pace.  The exact number of times that Plaintiff actually performed re-shops is unclear, but it appears it was infrequent, and in any event, as discussed below, he worked as a Greeter a maximum of only twenty days. *See*, Def. Summary Judgment Motion [#22], Ex. M at p. 18 ("I had been assigned to the front door as a greeter.  *Sometimes* they would have me do reshops *sometimes*." [sic])

(emphasis added). [2]

While performing his re-shopping duties, when Plaintiff came across an item which weighed more than 25 pounds, he simply "just didn't lift it" and left it in the cart. Plaintiff never violated his lifting restriction, and he was never disciplined for failing to re-shelve heavy items. Plaintiff maintains, though, as part of this action, that re-shelving items generally violated his doctor's restriction on repetitive use of hands. In that regard, Plaintiff now claims that he twice told his supervisors that re-shelving items violated his repetitive-use limitation. *See*, Pl. Resp. [#26], Appendix at pp. 5-6. However, Plaintiff's prior sworn testimony on this point suggests that he did not expressly complain to anyone about repetitive motion: "Q. Did you discuss that with an assistant manager? A. *They already knew that in writing* [from the doctor's note] that I wasn't supposed to, that I was to be reassigned to light duty." Def. Summary Judgment Motion [#22], Ex. M at p. 32 (emphasis added). Moreover, Plaintiff does not explain why, if he believed that re-shelving required "repetitive use" of his hands, he continued to do it, thereby violating his doctor's instructions, when he refused to violate the doctor's other limitation, on lifting items weighing more than 25 pounds.

In any event, Plaintiff was able to perform his re-shopping duties, and he does not indicate that he suffered any ill effects from doing so.[3]

September 30, 2008 was the last day that Plaintiff worked for Defendant. Plaintiff

---

[2]Plaintiff argues that his deposition, at pp. 129-130, establishes that he was "frequently" assigned to do re-shops. See, Pl. Memo of Law [#26] at p. 7. However, the record does not support such an inference.

[3]Apart from the conclusory statement in the Complaint that working "caused [his] preexisting injury to become more exastribated [sic] than usual." Complaint [#1], ¶ 19.

arrived at work at 10 p.m. and punched in, using his magnetic name badge, in the usual manner.  When Plaintiff arrived at the Greeter's station, Cherry acted surprised to see him, and indicated that she had heard a rumor that he had been fired.  Plaintiff advised Cherry that he had not been fired.  At 11:45 p.m., Plaintiff took a 15-minute break,[4] during which he tried to access Wal-Mart's intranet system to request a transfer to a different store, purportedly because he no longer felt comfortable at the Chili Ave. location.  Employees were entitled to access the intranet system on their breaks for that purpose.  Plaintiff tried to log onto the intranet three times, but according to him, he could not log on because the system did not recognize him as being "clocked in" that evening.  Plaintiff maintains that he attempted to again swipe his identification card to "punch in," but the system did not accept his card.

Immediately thereafter, while still on his break, Plaintiff approached Assistant Manager Frank Henry ("Henry").  Plaintiff did so, since he was concerned about the status of his employment, based on Cherry's comment about him being fired, and based upon the fact that his identification badge did not seem to be functioning.  Henry, who was standing and talking with Assistant Manager Dan Berner ("Berner") and Support Manager Frank Costello ("Costello") by the cash registers when Plaintiff approached, stepped aside to talk with him.  Plaintiff asked Henry if he was fired, to which Henry responded, "not to my knowledge."  Plaintiff then asked why his badge did not seem to be working.  Henry indicated that he did not know why Plaintiff's badge was not working, and said that he

---

[4]Plaintiff indicates that he normally took his break at midnight, but on this occasion a manager told him to take his break earlier.  To the extent that Plaintiff maintains that this minor variation was somehow indicative of discriminatory animus, the Court disagrees.

would "look into that."  At that point, it was a few minutes before midnight, and Henry told Plaintiff that he should return to work because his break was over.

Plaintiff returned to his Greeter's post for approximately one minute, then walked back to where Henry was still speaking with Berner and Costello.  An exchange followed, which, significantly, was captured on the store's video cameras, and was submitted to the Court as Exhibit J to Defendant's motion.  The video file does not provide sound, but Plaintiff testified at deposition concerning what was said.

The video shows Plaintiff briskly approaching Henry from behind, while Henry was still speaking with Berner and Costello.  Plaintiff threw his identification badge and lanyard to floor, and exclaimed, "This shit don't work!"   This abrupt interruption caused Henry to turn quickly and retreat several steps from Plaintiff, who is much larger physically than Henry.  Plaintiff pursued and stood directly in front of Henry in a confrontational manner. Plaintiff admits that he was upset because he felt that Henry had acted dismissively toward him in their prior conversation.  As Plaintiff was confronting Henry, Berner yelled"Abidan, back off!" and Plaintiff yelled back, "No. You back off!" while pointing at Berner.  Plaintiff walked away a few steps, then returned and stood directly in front of Berner and said, "My name is Abidan...I'm a man...I'm a grown man. You want to talk to me like a grown man...I'm tired of the way y'all treat people around here."   Plaintiff also accused store officials of "trying to play him."   Berner then told Plaintiff to leave the store,  to which Plaintiff replied, "I said what I had to say, I'm out of here," and left the store.  The incident took place in the front of the store, during business hours, with customers nearby.

Earlier that evening, another incident occurred at the store involving a black female associate named Chastity Travis.  As Travis was arriving at the store for her shift, she and

6

her boyfriend were standing outside, when the boyfriend suddenly shoved her, knocking her through the store's door. *See*, Miller Dep., [#27-2] at p. 7; *see also*, Pl. Appendix, Ex. C ("[A] young woman came tumbling through the now opened door and fell to the ground."). A store employee observed that, after Travis got up from the ground, she and her boyfriend yelled profanities at each other, and each called the police to complain about the other. See, Pl. Appendix, Ex. C. Travis' boyfriend had a welt and blood on his face, though it is unclear how he became injured. Miller Dep. [#27-2] at p. 11; *see also*, Pl. Appendix, Ex. C ("As for . . . what had caused the dispute and injury to the man, I did not see."). Afterward, Travis was upset, crying, and having a hard time talking, and a manager provided her with ice packs. *Id*. at pp. 7-9. Store management provided police with videotape of the incident, which did not show any physical altercation leading up to Travis being shoved through the door. *Id*. at pp. 7, 9. Defendant did not take any disciplinary action against Travis for violating the store's anti-violence policy, because it viewed her as being the victim of domestic violence. *See*, Irvine Dep. [#27-2] at p. 23 ("This was a domestic dispute with her boyfriend. Her boyfriend was beating her up and threw her though our door. The police were called and a police report was filed, so in this incidence, [sic] workplace violence did not apply to that.").

Later that day, Henry and Berner informed Store Manager John Irvine ("Irvine") about the incident involving Plaintiff. Irvine informed Plaintiff that he was suspended pending an investigation, which included reviewing witness statements, video surveillance and speaking with Plaintiff about the incident. On October 7, 2008, Irvine notified Plaintiff that he was being terminated for violating Wal-Mart's workplace violence policy, by intimidating, yelling at, and attempting to bully his supervisors.

7

On October 27, 2008, Plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR"), which was cross-filed with the Equal Employment Opportunity Commission ("EEOC").  The complaint alleged that Defendant fired Plaintiff because of his race and disability, and failed to accommodate him.  With regard to race, Plaintiff stated, in pertinent part:  "No black people in senior management position that could be sensitive to the needs of black employees. . . .  Intimidating all of the minority associates[.]  [They] told me they were intimated by me."  As for disability, Plaintiff wrote, in pertinent part: "Suffer from carpal tunnel syndrome, diabetes and hypertension still made to violate doctor's orders no repetitive motion made to do reshops in store." [sic]

The NYSDHR complaint further stated: "I was terminated for voicing my opinion in a loud voice."  When asked to explain why he believed that he was discriminated against, Plaintiff gave two examples.  First, he stated that a female employee, Travis, had been involved in a physical altercation with her boyfriend on Wal-Mart property, and was suspended but not terminated.  Second, Plaintiff indicated that Berner had raised his voice to him when telling him to "back off" from Henry, but Berner had not been disciplined.  On April 24, 2009, NYSDHR issued a "No Probable Cause" determination, dismissing Plaintiff's claims.

On September 18, 2009, Plaintiff filed a complaint with the Workers' Compensation Board ("WCB"), alleging that he was terminated in retaliation for filing his Workers' Compensation claim.  On July 16, 2010, following a trial, the WCB Judge dismissed the complaint, finding that Plaintiff's "angry confrontation" with his supervisors provided an adequate reason to fire him.  Plaintiff appealed, and on December 14, 2010, a WCB Panel upheld the dismissal, finding that Plaintiff had not produced "any evidence" that he was

terminated by Defendant in retaliation for filing for workers' compensation benefits.

On February 10, 2010, Plaintiff, proceeding *pro se*, filed the instant action. The Complaint [#1] indicates that Plaintiff is suing pursuant to Title VII and the ADA. On the form complaint, Plaintiff checked lines indicating that the discrimination involved Defendant terminating his employment, failing to accommodate him, and retaliating against him. Significantly, the only factual allegations in the Complaint pertain to Plaintiff's alleged disability. Specifically, when asked to briefly state the facts of his claim, Plaintiff wrote: "Was forced to work in a position of which continually caused my preexisting injury to become more exa[cerbated] than usual." Complaint [#1] ¶ 19. Attached to the complaint is a document entitled "Notice of intent to sue for discrimination," which, again, mentions only Plaintiff's alleged disability, and states, in pertinent part:

> The claim is founded in negligence on the part of the Wal-Mart Corp. for discrimination. Claimant states that the Wal-Mart Corp. did in fact not provide the claimant with reasonable accommodations for an injury sustained in the plaintiff's employment capacity pursuant *to Title VII of the Americans with Disability Act* of whom acted in a Discriminatory manner against the Claimant by not adhering to the ADA. The policy was being applied arbitrarily, in refusing to follow the ADA. The plaintiff also alleges that the Wal-Mart Corp. was discriminatory with respect to the New York Executive Law and the City's Administrative Code.

Complaint, Docket [#1] at p. 6 (emphasis added). Clearly absent from the Complaint is any factual allegation of discrimination based on race, sex, or religion. In fact, on the form complaint that Plaintiff used, which provided lines for litigants to indicate the basis for their discrimination claim, he marked the line for "disability," but left the lines for "race," "color," "sex" and "religion" blank. Complaint [#1] at ¶ 14.

One month after commencing this action, and prior to Defendant being served,

9

Plaintiff retained his current attorney, Christina Agola[5], who never sought to amend the Complaint, even though a pre-trial scheduling order gave her five months to do so. *See*, Scheduling Order [#16] (Granting parties until August 23, 2010 to file motions to amend pleadings.). Accordingly, the *pro se* -drafted Complaint, which Attorney Agola adopted and chose to proceed on, is the operative pleading in this action.[6]

The parties then conducted pretrial discovery. Although Plaintiff failed to appear for his first scheduled deposition, Defendant was eventually able to depose him.

Following the completion of discovery, Defendant filed the subject motion for summary judgment, which has now been fully briefed. In its motion, Defendant naturally focuses on Plaintiff's disability claim. Defendant also addresses a potential race discrimination claim, apparently because Plaintiff had checked a box for "Title VII" discrimination on the form complaint, and because during his deposition he claimed to have been discriminated against on the basis of his race. See, Def. Memo of Law [#22-2] at p. 8. As mentioned already, however, the Complaint contains no factual allegations of racial discrimination, and the line marked "race" is left blank.

In opposition, Plaintiff begins, bizarrely, by arguing that although Defendant does not address it, he has a meritorious *gender* discrimination claim: "Plaintiff has sufficiently

---

[5]Ms. Agola filed her Notice of Appearance [#5] on March 15, 2010. Defendant was not served until March 27, 2010. See, Docket No. [#6].

[6]*See, Hanna v. Brown*, 93 C 3105, 1995 WL 103789 at * 2 (N.D.Ill. Mar. 6, 1995) ("[O]nce [plaintiff] retained an attorney, his original *pro se* status no longer entitled him to a liberal interpretation of his pleadings. Although plaintiff initiated the complaint to the MSPB *pro se*, counsel could and should have added the charge of racial discrimination by amending the complaint, filing a post hearing pleading, or by alleging racial discrimination in the subsequent EEOC charge."). The Court can only assume that in deciding whether to take Plaintiff's case, Ms. Agola reviewed the Complaint that had already been filed in this Court. Since she made no attempt to amend the Complaint, the Court further assumes that she believed it accurately set forth Plaintiff's claim against Defendant.

established a claim for discrimination on the basis of gender in violation of Title VII." Pl. Memo of Law [#26] at p. 2; see also, *id*. at 3 ("Plaintiff has *clearly* also alleged discrimination based on gender.") (emphasis added). Plaintiff states that it is "unclear" why Defendant would think he did *not* have gender discrimination claim, "since neither the Complaint, nor any other evidence/testimony in this case, have so *limited* the ground(s) upon which Plaintiff seeks relief under Title VII." *Id*. at 2 (emphasis added). In this regard, Plaintiff seems to make the novel argument that, although the Complaint does not plead a gender discrimination claim, he may nonetheless pursue such a claim, or any possible claim under Title VII, as long as the Complaint does not "limit" or exclude it, since the "Title VII" box was checked on the form complaint. Plaintiff further maintains, in effect, that he may pursue such claim because he claimed, *at his deposition*, to have suffered gender discrimination in relation to the treatment that Travis received,[7] even though he did not seek permission to amend his Complaint after the deposition to include a gender discrimination claim. *Id*.

Plaintiff further argues that there are triable issues of fact as to the true reason that Defendant fired him, since Berner allegedly "yelled at him first." See, Pl. Memo of Law [#26] at p. 4 ("It was manager Berner that started yelling at Plaintiff first; Plaintiff raised his voice in reaction to manager Berner first raising his voice.") Of course, this argument flies in the face of the undisputed video evidence that it was Plaintiff who initiated the confrontation by aggressively approaching the three supervisors, throwing his badge on

---

[7] *See*, Pl. Memo of Law [#26] at p. 5-6 (Arguing that Travis should have been disciplined because she was "involved in a physical altercation at the store <u>on the same date as the Plaintiff's alleged incident</u> [and] was not disciplined at all.") (emphasis in original).

the floor and declaring, "This shit don't work!"

As for his ADA discrimination claim, Plaintiff argues that his carpal tunnel syndrome is a disability under the ADA, and that Defendant failed to accommodate that disability, in at least two respects.  First, he maintains that his assignment as a greeter was not a reasonable accommodation, since Cherry was also working as a greeter, and in his opinion, "[t]here [is] only supposed to be one  Greeter at the door at a time."[8] Pl. Memo of Law [#26] at p. 7.  And second, he contends that his "re-shop" duties "involved repetitive motion." *Id*. at p. 8.

Finally, Plaintiff argues that Defendant retaliated against him, in part, by "requiring Plaintiff, who is Muslim, to physically move pork products even though it was against his religious beliefs to do so." Pl. Memo of Law [#26] at p. 8.

DISCUSSION

*Rule 56*

Summary  judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  "[T]he movant must make a prima facie showing  that  the  standard  for  obtaining  summary  judgment  has  been  satisfied."  11

---

[8]In support of this assertion, he cites to pages 129-130 of Exhibit A of his Appendix.  However, there are no such pages included in Exhibit A of his Appendix, which begins at page 133.  They are, however, included in Ex. A to Defendant's summary judgment motion.  Nevertheless, those pages do not support Plaintiff's claim that there should be only one greeter at the door.

MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).  Once that burden has been established, the burden shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249.

The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(e).  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

Courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question.  Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (citations

and internal quotations omitted). Nevertheless, it is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). Moreover, a plaintiff may not defeat a motion for summary judgment merely by relying upon "purely conclusory allegations of discrimination, absent any concrete particulars." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985), *cert. den.* 474 U.S. 829 (1985).

### *Plaintiff's Attempt to Raise Unpleaded Claims at Summary Judgement Stage*

As discussed above, the only claim that is arguably pleaded in the Complaint [#1] is that Defendant discriminated and retaliated against Plaintiff because of a disability. In attempting to defeat summary judgment, Plaintiff is now attempting to raise claims and instances of discrimination based on race, sex, and even religion. This attempt must fail. *See, Valentine Properties Assocs., LP v. U.S. Dept. of Housing and Urban Dev.*, 785 F.Supp.2d 357, 372 (S.D.N.Y. 2011) (collecting cases denying plaintiffs' attempts to raise unpleaded claims at the summary judgment stage); *Thomas v. Egan*, 1 Fed.Appx. 52, 54, 2001 WL 30667 at *1 (2d Cir. Jan. 10, 2001) ("A claim must be set forth in the pleadings, in order to give defendants fair notice of the nature of the plaintiff's claim. Thus, it is inappropriate to raise new claims for the first time in submissions in opposition to a summary judgment motion.") (citations omitted).

Plaintiff's counsel acts as though she can pursue any possible claim under Title VII, despite the absence of any supporting factual allegations in the Complaint, merely because the "Title VII" box on the form complaint is checked. Clearly, that is not the law. *See, DiProjetto v. Morris Protective Serv.*, 489 F.Supp.2d 305, 308–309 (W.D.N.Y.2007) (Merely

checking a box on a form discrimination complaint is not sufficient to state a plausible claim under Title VII or the ADA), *affirmed*, 306 Fed. Appx. 687, 2009 WL 102751 (2d Cir. Jan. 15, 2009).

It is bad enough that Plaintiff is attempting to raise these unpleaded claims now, after passing up the opportunity to amend the Complaint.  Even worse is that these claims, even if they were pleaded, are completely frivolous.  For example, Plaintiff's purported racial discrimination is based only on his self-serving opinion that because his supervisors were white, they could not be "sensitive to the needs of black employees."  Similarly, the alleged instance of religious discrimination claim is based on the fact that on one occasion, after accepting a job that obviously required him to work with all kinds of meat, Plaintiff stated that he could not touch pork.[9]  Moreover, his purported gender discrimination claim is based on his belief that he should not have been terminated for aggressively and rudely confronting his supervisors for no good reason, since a female employee, who was assaulted and thrown through the front door of the store by her boyfriend, and who was therefore obviously not similarly situated, was not disciplined.

To summarize, the only claim that is properly before the Court is a discrimination claim under the ADA.  Any other claim that Plaintiff is now attempting to assert is unpleaded and therefore not part of this action.

*Americans With Disabilities Act*

The general legal principles applicable to ADA disability discrimination claims are clear:

---

[9]This alleged instance of religious discrimination was not even raised, much less exhausted, at the administrative level.

> A plaintiff suing under the ADA for disability discrimination bears the burden
> of establishing a prima facie case. In so-called reasonable- accommodation
> cases, such as this one, the plaintiff's burden requires a showing that (1)
> plaintiff is a person with a disability under the meaning of the ADA; (2) an
> employer covered by the statute had notice of his disability; (3) with
> reasonable accommodation, plaintiff could perform the essential functions
> of the job at issue; and (4) the employer has refused to make such
> accommodations.

*Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 183 -184 (2d Cir. 2006) (citation and

internal quotations omitted).

"Whether or not something constitutes a reasonable accommodation is necessarily

fact-specific.  Therefore, determinations on this issue must be made on a case-by-case

basis." *Wernick v. Federal Reserve Bank of New York*, 91 F.3d 379, 385 (2d Cir. 1996).

However, "[w]hile the reasonableness of a given accommodation may in some cases turn

on factual issues that are for a jury to decide, summary judgment for the employer is

nevertheless appropriate if the evidence shows that the employer offered an

accommodation that was plainly reasonable." *Bielski v. Green*, 674 F.Supp.2d 414, 424

(W.D.N.Y. 2009) (citations omitted); *see also, Wernick v. Federal Reserve Bank of New

York*, 91 F.3d at 385 (affirming grant of summary judgment where accommodation offered

by employer was "plainly reasonable.").

Where a plaintiff claims that he is actually disabled, "disability" means "a physical

or mental impairment that substantially limits one or more major life activities of such

individual." 42 U.S.C.A. § 12102(1)(A) (West 2012).[10]  At the time of the alleged

---

[10]Under the current version of the statute, "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C.A. § 12102(2)(A).

discrimination in 2008, "major life activities" included

> caring for oneself, walking, seeing, hearing, speaking, breathing, learning and working[,] 29 C.F.R. § 1630.2(I)[, and w]hether an impairment substantially limit[ed] a major life activity [was] determined by considering: (1) the nature and severity of the impairment; (2) the duration of the impairment; and (3) the impairment's permanent or long-term impact[,] 29 C.F.R. § 1630.20(2).

*Edwards v. Elmhurst Hosp. Ctr.*, No. 07–CV–2452 (RRM)(LB), 2009 WL 6683365 at *4 (E.D.N.Y. Sep. 17, 2009), report and recommendation adopted by 2010 WL 2874113 (E.D.N.Y. Jul. 19, 2010).

Plaintiff maintains that he was actually disabled, within the meaning of the ADA. *See*, Pl. Memo of Law [#26] at p. 7.[11]  Plaintiff contends that his "disability" is carpal tunnel syndrome. *See, id.*; *see also*, Pl. Response to Def.'s Stmt. of Facts [#26-2] at ¶ 47. However, with the possible exception of the major life activity of "working," Plaintiff's papers submitted in opposition to summary judgment do not identify a particular "major life activity" that is limited by his carpal tunnel syndrome.  Instead, Plaintiff claims only that such disability affected him by preventing him from lifting more than 25 pounds and using his hands repetitively.  He further states that such limitations prevented him from performing the functions of his job as a deli stocker.  According to Plaintiff's doctor, such limitations were temporary, and lasted only until October 1, 2008.

Where an ADA plaintiff relies on the major life activity of "working," "the individual can do so by showing that the impairment substantially limits his or her ability to perform a class of jobs or broad range of jobs in various classes as compared to most people

---

[11]He is not proceeding on the basis of having a record of an impairment, or of being regarded as having such an impairment. See, 42 U.S.C.A. § 12102(1).

having comparable training, skills, and abilities." 29 C.F.R. Pt. 1630, App.  However, "[d]emonstrating a substantial limitation in performing the unique aspects of a single specific job is not sufficient to establish that a person is substantially limited in the major life activity of working." 29 C.F.R. Pt. 1630, App.

The issue presented here is whether Plaintiff is disabled under the ADA because he had a doctor's restriction, limiting him to lifting less than 25 pounds, with no repetitive use of his hands.  The Court concludes, as a matter of law, that he was not disabled. *See, Ryburn v. Potter*, 155 Fed.Appx. 102, 110, 2005 WL 2476338 at *6 (5th Cir. Oct. 7, 2005) ("Because these medical restrictions affect only a narrow range of jobs requiring fine manipulation and heavy lifting, the district court correctly found that Ryburn was not substantially limited from the major life activity of working.") (citation and footnotes omitted); *Adams v. Potter*, 193 Fed.Appx. 440, 444, 2006 WL 2431118 at *4 (6th Cir. Aug. 22, 2006) ("[T]o classify Adams as disabled because he cannot lift heavy objects or stand for long periods of time or engage in repetitive bending, twisting, or stooping motions would require a broad definition of disability-a definition that would cover almost everyone who suffers from back problems. Such a definition is too broad[.]"); *Riley v. Potter*, Civil Action No. 08–5167 (SDW)(MCA), 2011 WL 3841530 at *8-9 (D.N.J. Aug. 25, 2011) (Finding employee with restrictions on lifting and repetitive use of arms was not disabled under the ADA).

Moreover, even assuming that Plaintiff's restrictions qualify as a disability under the ADA, the Court finds as a matter of law that Defendant reasonably accommodated those restrictions.  In that regard, "an employer is not required to provide every accommodation a disabled employee may request, as long as the accommodation provided is reasonable."

18

*Krikelis v. Vassar College*, 581 F.Supp.2d 476, 486-487 (S.D.N.Y. 2008) (*citing Fink v. N.Y. City Dep't of Pers.*, 53 F.3d 565, 567 (2d Cir.1995)).

Here, Defendant assigned Plaintiff as a Greeter, which did not violate his doctor's restrictions.  Plaintiff admits that the greeter's job could be performed either sitting or standing, and it is hard to imagine a less strenuous job.  Accordingly, the only possible basis for Plaintiff's "failure to accommodate" claim is his opinion that the periodic act of re-shopping, i.e., putting various items on shelves throughout the store at his own pace, amounted to "repetitive use of hands."[12]  However, Plaintiff admittedly was able to perform his re-shopping duties without any problems. Def. Summary Judgment Motion [#22], Ex. A, Pl. Deposition at pp. 145-146.  For example, Plaintiff has not shown that performing re-shops caused him pain or caused his condition to worsen.

Defendant gave Plaintiff a non-taxing assignment as an accommodation, and Plaintiff's complaint about one aspect of that assignment, i.e. re-shops, which he was able to perform, does not create a triable issue of fact as to the reasonableness of the accommodation. *See, Krikelis v. Vassar College*, 581 F.Supp. at 487-488 ("Although Plaintiff views the accommodation offered as insufficient for her condition, the relevant legal question is whether it was a reasonable accommodation as part of the interactive process in light of Plaintiff's contributions to that process.  . . .  [G]iven Defendants' response to Plaintiff's doctors note, Plaintiff was required to produce something more-a further doctor's note, a written explanation of the insufficiency of the offered accommodation-before Defendants' could be required by law to revise the offered

---

[12]Plaintiff's alternative argument, that the accommodation was not reasonable because it involved both him and Cherry acting as greeters at the same time, is utterly lacking in merit.

accommodation.   To make any other finding would entirely defeat the axiom that an employer is required only to provide reasonable accommodation and not every accommodation that an employee may request.") (citations omitted); *see also, Steffes v. Stepan Co.*, 144 F.3d 1070, 1073 (7th Cir. 1998) ("Steffes did not provide any further information to the company. Because Steffes failed to hold up her end of the interactive process by clarifying the extent of her medical restrictions, Stepan cannot be held liable for failing to provide reasonable accommodations.") (citation omitted); *Young v. Central Square Cent. School Dist.*, 213 F.Supp.2d 202, 213-214 (N.D.N.Y. 2002) ("If the interactive process breaks down, courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary.   In this regard, failure to provide the information necessary to determine what accommodations can be provided may be the cause of the breakdown and the party withholding the information may be found to have obstructed the process.") (citations and internal quotation marks omitted).

The record indicates that Defendant accommodated Plaintiff, by granting him all the leave time he requested, and then by placing him in a light-duty position.   Accordingly, there is every reason to believe that if Plaintiff had brought in additional information from his doctor, indicating that he should not be doing re-shops, then Defendant would have further accommodated him.   The Court finds that it was incumbent on Plaintiff to take further action in this instance, and his failure to do so cannot result in Defendant being liable for refusing to provide a reasonable accommodation.   Defendant is therefore entitled to summary judgment on the "failure to accommodate" claim.

_ADA Retaliation Claim_

To the extent that Plaintiff is asserting an ADA retaliation claim, it must also be dismissed.  To establish a prima facie case of retaliation under the ADA, a plaintiff must present "evidence sufficient to permit a rational trier of fact to find (1) that she engaged in protected participation or opposition under the ADA, (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, _i.e._, that a retaliatory motive played a part in the adverse employment action." _Lovejoy-Wilson v. NOCO Motor Fuel, Inc._, 263 F.3d 208, 223 (2d Cir. 2001) (citation and internal quotation marks omitted).

Plaintiff cannot establish an ADA retaliation claim because he did not engage in protected activity under the ADA.  On this point, merely filing a worker's compensation claim is not protected activity under the ADA. _See, Fleury v. New York City Transit Auth._, No. 02-CV-5266 SJF LB, 2004 WL 2810107 at *5 (E.D.N.Y. Dec. 8, 2004) (Filing a worker's compensation claim is not a protected activity under the ADA), _affirmed in part, vacated in part on other grounds, by_ 160 Fed.Appx. 34 (2d Cir. Dec. 15, 2005).

Furthermore, courts in this Circuit have held that a plaintiff's exclusive remedy for alleged retaliation for filing a worker's compensation claim is under New York's Worker's Compensation Law. _See, De la Cruz v. City of New York_, 783 F.Supp.2d 622, 646-647 (S.D.N.Y. 2011) ("The New York Workers' Compensation Law provides the 'exclusive remedy' for employees seeking to recover compensation for work-related injuries caused by their employer's negligence. N.Y. Workers' Comp. Law § 29(6). The Workers'

Compensation Law likewise provides the exclusive remedy for an employee's claim that his employer discriminated *or retaliated* against him for filing, or attempting to file, a workers' compensation claim. *Id*. § 120.") (emphasis added, citation omitted).  Plaintiff already tried unsuccessfully to bring such a claim before the Worker's Compensation Board. *See*, Def. Summary Judgment Motion [#22], Ex. M (Minutes of Trial before New York State Worker's Compensation Board on retaliation claim brought pursuant to Worker's Compensation Law § 120), Q (Decision denying claim) and R (Appeal Board Panel decision affirming denial of claim).

### *Sanctions*

For the reasons discussed above, the Court finds it necessary to raise the issue of sanctions *sua sponte*.  While more than one aspect of Ms. Agola's representation in this case could be sanctionable, the Court will limit itself to the most obvious, which is her attempt to raise an unpleaded and unmeritorious gender discrimination claim at the summary judgment stage.  Specifically, in response to Defendant's summary judgment motion, Ms. Agola stated to the Court that "Plaintiff has *clearly* also *alleged* discrimination based on gender." Pl. Memo of Law [#26] at p. 3.  However, on that point, the issue before the Court was not what Plaintiff might have alleged in a prior administrative complaint, or what he might have alleged in his deposition.  The issue was whether a gender discrimination claim was pleaded in this action, and it clearly was not.  Therefore, Ms. Agola's statements on this point were misrepresentations to the Court.

Ms. Agola's conduct in this regard is not atypical of her practice before this Court. She has in the past pursued meritless claims, making baseless arguments to avoid

summary judgment. *See, e.g., Rojas v. Roman Catholic Diocese of Rochester*, 783 F.Supp.2d 381 (W.D.N.Y. 2010) (Disregarding sham evidence submitted by Agola in opposition to summary judgment), *affirmed*, 660 F.3d 98 (2d Cir. 2011); *Colombo v. East Irondequoit Cent. Sch.*, No. 07–CV–6270 CJS, 2010 WL 6004378 at *10, n. 8 (W.D.N.Y. Dec. 17, 2010) ("Factual misstatements are a recurring problem with Ms. Agola's submissions to the Court.") (collecting cases); *Gilderhus v. Concentrix Corp.*, 825 F.Supp.2d 414, 417, n.2 (W.D.N.Y. 2011) (Referring to Agola's "feeble attempt" to avoid summary judgment by mis-characterizing deposition testimony).

Accordingly, the Court will require Ms. Agola to show cause in writing why sanctions should not be imposed on her for violating Federal Rule 11(B)(1),(2),(3) and (4), and 28 U.S.C. § 1927,[13] for acting in bad faith in connection with her argument that Plaintiff had a meritorious gender discrimination claim.[14] *See, In re Pennie & Edmonds LLP*, 323 F.3d 86, 89-91 (2d Cir. 2003) (Holding that court must apply "bad faith" standard where it raises Rule 11 sanction issue *sua sponte*, when attorney no longer has opportunity to withdraw the offending submission); *see also, Arclightz and Films Pvt. Ltd. v. Video Palace, Inc.*, No. 01 Civ.10135(SAS), 2003 WL 22434153 at *7 (S.D.N.Y. Oct. 24, 2003) ("Bad faith conduct

---

[13]28 U.S.C. § 1927 provides that "[a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."

[14]When Ms. Agola filed her notice of appearance after Plaintiff had filed the Complaint *pro se*, she did not file a separate Rule 11 certification. However, such fact does not insulate her from Rule 11 sanctions. *See, Turner v. Sungard Bus. Sys., Inc.*, 91 F.3d 1418, 1421 (11th Cir. 1996) ("[I]t is well established that Rule 11 applies to all papers filed in a suit. The district court found that "from the moment he appeared on the plaintiff's behalf, Penick [plaintiff's attorney] had actual knowledge that there was no merit to the plaintiff's assertions, or, at the very least, he consciously decided not to inquire of the merits." That the only "paper" Penick signed and submitted to the court in prosecuting Plaintiff's claim was the notice of appearance is unimportant. By appearing in this case, Penick affirmed to the court that the case had arguable merit. In this sense, it was as if Penick had refiled the complaint.").

may include pursuing frivolous contentions, frivolous motions,or intentionally dilatory conduct.") (citations and internal quotation marks omitted).

CONCLUSION

Defendant's motion for summary judgment [#22] is granted.  Plaintiff's attorney, Christina Agola, Esq., is ordered to show cause, in writing, within 21 days of the date of this Decision and Order, why the Court should not impose sanctions against her pursuant to FRCP 11(b)(1),(2),(3) & (4) and 28 U.S.C. § 1927.

SO ORDERED.

Dated:   August 2, 2012
          Rochester, New York

ENTER:


/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge